FILED

2008 Mar-10  PM 02:15
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| ABC ADVERTISING AGENCY, INC., et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | Case No. 7:05-cv-01216-HGD |
| | ) | |
| PAUL JOSEPH LAKE, et al., | ) | |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the cross motions for summary judgment filed by the parties.  (Docs. #58 & 60).  Plaintiff/counterclaim defendant, ABC Advertising Agency, Inc. (ABC), is a Missouri corporation with its principle place of business in Sedalia, Missouri.  Plaintiff/counterclaim defendant, William Crabtree, is a Missouri resident.  Defendant/counterclaim plaintiff, Paul Joseph Lake, is a resident of the Northern District of Alabama.[1]  Plaintiffs allege in their amended complaint that defendants (1) used their trade secrets without the

---

[1] In their complaint and amended complaint, plaintiffs name as defendants Paul Joseph Lake and Lake & Associates.  In the answer and counterclaim, defendant identifies himself as Paul Joseph Lake d/b/a Lake & Associates.  The court considers the named defendants to be both Paul Joseph Lake and Lake & Associates.

privilege to do so, (2) interfered with their contract with a business identified as City Café, (3) violated an Independent Distributors' Agreement that he had with plaintiffs, (4) was unjustly enriched by the use of plaintiffs' confidential information which he misappropriated, and (5) suppressed the fact that he intended to copy a patented tabletop advertising display and manufacture, sell, and/or distribute these copies to plaintiff's customers and potential customers. (Doc. #17, Amended Complaint, at Counts 1, 2, 3, 7, and 8, respectively). Three other claims in the amended complaint subsequently were dismissed by plaintiffs. (Doc. #48, Motion to Dismiss Counts 4, 5, and 6).[2]

Defendant filed a counterclaim alleging that plaintiffs have interfered with his business relations and defamed his prospective restaurant customers and advertising customers by representing to them that defendant's business is unlawful or illegal. He further asserts that the conduct by plaintiffs, including plaintiffs' amended complaint, is an effort to eliminate competition in violation of state and federal anti-trust laws. (Doc. #22, Answer to Amended Complaint and Counterclaim).

---

[2] These counts alleged patent infringement; false designation of origin, false description, and false representation in violation of the Trademark Act; and conversion of plaintiff Crabtree's patent.

Both sides of this dispute have filed motions for summary judgment. The issues have been briefed and evidentiary submissions have been made to the court. Therefore, these motions are ready for disposition.

## SUMMARY JUDGMENT

This matter is considered by the court pursuant to the provisions of Rule 56, Fed. R. Civ. P. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers

to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *Id*. at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). It is, therefore, under this standard that the court must determine whether either movant can meet his burden of coming forward with sufficient evidence as to each material element of his claim sufficient to permit a reasonable jury to find in his favor.

## FACTUAL BACKGROUND

Plaintiff Crabtree is the President and Chairman of the Board of ABC Advertising, Inc. (Crabtree Depo. at 6-7, 14, 24-25). ABC manufactures and sells tabletop advertising displays that are placed in various restaurants. (*Id*. at 66). These tabletops are manufactured by ABC to include ads from local businesses that have been sold by the ABC sales force. ABC's sales force consists of independent distributors who sign agreements with ABC called the "Independent Distributors Agreement." (*Id.*). These distributors utilize a "Sales Kit" containing procedures and policies which they purchase from ABC for around $900. (*Id.*). This Sales Kit is prepared by ABC. (*Id*. at 34). Much of the information contained in the Sales Kit came from seminars and other training that Crabtree attended over the years. (*Id*. at 33-34). According to Crabtree, the information contained in the Sales Kit was gathered and assembled by ABC based on knowledge gained over 15 years. (*Id*. at 92). He testified that plaintiffs have progressively added particulars of the ABC advertising business to the Sales Kit to make it apply to the specific area of tabletop advertising. (*Id*. at 33-34). It was prepared specifically for use by ABC in its tabletop advertising business. (*Id*. at 34). Distributors also utilize an ABC-supplied "Restaurant Manual" and "Notice Cards" which were developed "piece-by-piece by trial and error over the last 15 years." (*Id*. at 105, 110).

ABC makes its money directly from the Independent Distributors, who purchase the ad-containing tabletops to be installed in restaurants from ABC for $12,000. (*Id.* at 68-69, 70-71). The Independent Distributor makes his or her money from the sale of the advertisements to be placed on the tabletops. (*Id.* at 69). ABC does not receive any of the money generated from the sales of the advertisements. (*Id.* at 71). ABC also offers a bonus to its Independent Distributors if they recruit other Independent Distributors. (*Id.*).

Defendant Lake is a native of Moundville, Alabama, a town located south of Tuscaloosa, Alabama. He testified that in the summer of 2004 he was living in a homeless mission in Panama City, Florida, and selling cars for a local dealership when he met an ABC distributor, Jack Baker. (Lake Depo. at 10-11, 26-29). Baker told Lake about the business opportunity presented by ABC and showed him ABC's standard sample tabletop. (*Id.* at 33). Baker also showed him the ABC web site, what ABC's advertisements looked like, a video of Crabtree, and the contents of the Sales Kit used by ABC's Independent Distributors. (*Id.* at 33; Lake Aff.).

Baker assured Lake that the market was open and that he could go wherever he wished to sell for ABC. (Lake Depo. at 61; Lake Aff.). Baker told Lake he first would need to purchase a Sales Kit from ABC for about $900. (Lake Depo. at 39-40; Lake Aff.). He also represented to Lake that he would put up one-half of the $12,000

when Lake purchased his first set of tables.  (Lake Depo. at 117-19; Lake Aff.).  Lake

testified that his sister loaned him the $900 necessary to purchase a sales kit from

ABC.  (Lake Depo. at 43).

Shortly after his meeting with Baker, Lake made an application for association

with ABC.  (Lake Depo. at 41).  He received more paperwork from ABC, including

an independent distributor agreement.  (*Id*. at 51).  He filled out the paperwork and

faxed it back to ABC.  (*Id*. at 52-54).  By this time, Lake had relocated from Panama

City to his hometown of Moundville, Alabama.  (*Id*. at 42-43).

Shortly thereafter, Lake received a package from FedEx which included the

ABC Sales Kit and a sample tabletop.  (*Id*. at 60, 62).  Lake testified that he opened

the package in front of the FedEx deliveryman who advised him that he had seen

tabletops like this one at City Café in Northport, Alabama.  (*Id*. at 63-64, 73).

Lake went to City Café, spoke to the owner, Jack Barger, and discovered that

the restaurant's contract with ABC was about to expire.  (*Id*. at 72-75, 82).  Barger

told Lake that he did not want to renew his contract with ABC unless he received a

percentage of the ad revenue.  (*Id*. at 77-78, 83).  Lake testified that he told Barger

that he would contact ABC and get back with him on this.  (*Id*. at 83).  Lake testified

that he did not know what to do, so he called Jack Baker from the City Café parking

lot.  (*Id*. at 91).  Baker wanted Lake to find some way to sign up Barger despite his

reluctance, but offered no guidance on how to accomplish this. (*Id*. at 78-80).  Baker also told Lake that he would call Crabtree to tell him about the City Café and the fact that it was up for renewal. (*Id*. at 80-81).

Later that same day, Lake received a call from Crabtree.  Crabtree introduced himself and told Lake that he could not work in the Tuscaloosa area because ABC was performing surveys[3] in that area. (*Id*. at 96, 98).  He advised Lake that he could work out of other Alabama cities, such as Huntsville or Montgomery. (*Id*. at 97).  After this conversation, Lake called Baker and told him that he was disappointed because he could not work in the Tuscaloosa area and was going to have to go to Huntsville or Montgomery to work.  He advised Baker that this was not something that he wanted to do. (*Id*. at 103).

Lake stated that he was upset because Baker had told him that "the market was open" and that he could "go where [he] wanted to go and sell what [he] wanted to sell." (*Id*. at 104-05).  Baker told Lake he would contact Crabtree to try to get him to agree to let Lake work in Tuscaloosa. (*Id*. at 106).  Baker called back later and told Lake that Crabtree wanted him to work in Huntsville or Montgomery. (*Id*. at 108).

---

[3] A survey, as the term is used by ABC, is a survey of which restaurants people eat at in a given area. (Lake Depo. at 111-12).

Lake was told that he could not work in Tuscaloosa because someone else was already working there.  (Crabtree Depo. at 184-85).

According to Crabtree, no one working for ABC had a defined geographic sales territory.  (Crabtree Depo. at 123).  He testified that, if a person wanted to work a particular area, this information was sent into the office to see if anyone else was already working that area.  If not, then the salesman is allowed to work in that area.  However, if someone is already working there, he is not allowed to do so unless the population will support more than one distributor.  Crabtree explained that the statement that there are no sales territories means that an individual could work in the northern states in the summer and the southern states in the winter.  He would not be tied to one geographical territory.  (*Id*. at 123-26, 131).  The Independent Distributor Agreement entered into between plaintiffs and Lake states:  "The Independent Distributor agrees that his or her territory or working area is not defined by geographical boundaries, but is to consist of restaurants approved in writing by the company."

After this conversation, Lake called his brother, Robert.  (Lake Depo. at 116-17).  Lake told his brother about the advertising business and wanted him to look at it.  Robert told him to come see him.  (*Id*. at 117).  The purpose of Lake's call to his brother was to see if he could get the $6,000 or $7,000 he needed to buy tables from

ABC.  (*Id.*).  Lake took the sample tabletop to his brother for him to see.  He also took some of the other information he received from ABC to show him.  (*Id*. at 119).  However, Lake does not recall which binder or binders he showed his brother or what was in them.  (*Id*. at 119-26).

Lake's brother looked through the material Lake had received from ABC.  Lake also told his brother that he needed about $6,000 or $7,000 to purchase the tables.  His brother commented that this was a lot of money.  (*Id*. at 130).  His brother told him that if Lake would go out and sell advertising, his brother could have the tables made, rather than having to buy them from ABC.  (*Id*. at 131, 134).  After his conversation with his brother about this, Lake stated that he no longer considered himself as working for ABC.  (*Id*. at 132-33).

After this, Lake went to his brother-in-law, Scott Kidwell, and had him print out a contract for the City Café, showing percentages of the ad revenues he and his brother had decided to pay Barger.  (*Id*. at 148).  He showed his brother-in-law a form used by ABC to go by when making up this contract.  (*Id*. at 149-50).  He did not receive permission from ABC before doing this.  (*Id*. at 154).

Lake also had his brother-in-law make up a purchase agreement form by copying the ABC form agreement.  (*Id.* at 155).  He also used other forms he received from ABC without changing them at all.  (*Id*. at 157).

The following day, Jack Baker called Lake and wanted him to come to work with them in other areas.  Lake told Baker that he was not interested because he had been away from home long enough.  He told Baker that he was "going a different direction," but he did not say what that direction was.  (*Id*. at 159-60).  He did not tell Baker that he was now in competition with ABC or that he was going to call on Barger again.  (*Id*. at 160).

Lake testified that he then took his contract to Barger and offered him a percentage of the revenue, and Barger agreed.  (*Id*. at 163, 165).  This was on August 19, 2004, ten days after he had entered into the contract with ABC.  (*Id*. at 172).  He continued to use the tabletop he received from ABC, with the ABC logo removed, as a sample when selling advertising.  (*Id.* at 175-76).  He did so without permission from ABC.  (*Id*. at 176).

Lake also testified that he is suing ABC and Crabtree for slandering him and interfering with his business.  (*Id.* at 206).  According to Lake, Crabtree went to one of his restaurant customers, Buddy Hall, and told him that he was going to be in court and that Lake was breaking the law because he had copied his business.  (*Id*. at 206-07).  However, Lake was unable to point to any financial loss resulting from this action.  (*Id.* at 211).

Lake also stated that an ad customer, Tracy Hyche, was told by Crabtree that he would never see his ad in Buddy's Restaurant and that Lake had stolen his idea. (*Id*. at 212, 223).  A similar action occurred with another ad customer, Dreamland Ribs.  (*Id*. at 213).  However, the advertisements were placed at Buddy's in a timely manner and Lake was paid.  (*Id*. at 213-14).  Likewise, Crabtree's actions did not hurt his business relationship with Jack Barger.  (*Id*. at 225).

The Independent Distributors Agreement which was entered into between plaintiffs and defendant Lake provides, in pertinent part:

* * *

> 10. The Independent Distributor is to conduct his or her business in a loyal, moral, and ethical manner at all times and will not do anything to harm the reputation of other Independent Distributors associated with the company, or do anything to harm the reputation of the Company.

* * *

> 12.  The Independent Distributor agrees that his or her territory or working area is not defined by geographical boundaries but is to consist of restaurants approved in writing by the Company.  Once an Independent Distributor has taken on an account approved by the Company, that restaurant location will remain that Independent Distributor's account for as long as the Independent Distributor properly services that account.  To properly service such account would include such things as selling additional sets of tables at said restaurant if restaurant is large enough to accommodate more than one set of tables. Additional sets should be put in within three to six months

> of each other unless the restaurant owner requests an extension of time in writing to the Company.
>
> * * *
>
> 19.  Independent Distributor agrees to deposit $12,000.00 before commencing actual sales presentations to restaurants and advertisers. Failure to make this deposit on or before the date of the first sales could result in cancellation.  All other costs generated from a project are due before shipping.

(Doc. #60, Defendant's Appendix 1C).

Lake initialed each of the above-quoted paragraphs of the Independent Distributors Agreement and signed the last page.  It is not disputed that Lake never paid the $12,000 deposit before commencing his first sales presentation to City Café in Northport, Alabama, shortly after he signed the Independent Distributor Agreement.

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**A.  Violation of Alabama Trade Secrets Act**

Count One of the plaintiffs' amended complaint alleges that Lake misappropriated trade secrets belonging to ABC without a privilege to do so, in violation of the Alabama Trade Secrets Act (ATSA), *Ala. Code* §§ 8-27-1, *et seq.* (1975).  The ATSA defines a trade secret as information that:

a.   Is used or intended for use in a trade or business;

b.   Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;

c.   Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;

d.   Cannot be readily ascertained or derived from publicly available information;

e.   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and

f.   Has significant economic value.

*Ala. Code* § 8-27-2 (1975).

Plaintiffs' response to defendant's motion for summary judgment lacks specificity.  The court has reviewed ABC's Sales Kit, Notice Card, and Restaurant Manual and cannot find that they contain any information that is not readily available to the public.  Additionally, plaintiffs have not pointed out to the court what specific information in these documents they claim is either not already generally known in the trade or business or is unavailable to the general public.  The Sales Kit, Notice Card, and Restaurant Manual contain no sales data, customer lists or other information that is generally considered trade-secret information.  *See W. L. Halsey Grocery Co. v. The Merchants Company, Inc.*, 897 So.2d 1028, 1034 (Ala. 2004)

(documents such as those used to forecast sales, to determine what prices should be quoted to certain customers, to create financial statements or to pay taxes are types of documents considered trade secrets). Letters from satisfied customers do not qualify as trade secrets. Likewise, the list of statements contained in the Sales Kit about the value of tabletop advertising to be presented to potential customers is not information the average businessman in this business would not already know. The fact that Crabtree spent a number of years compiling it does not make it trade secret information, so long as it came from publicly available information or is information that average sales competitors would already know. Additionally, the tabletops themselves are distributed publicly in restaurants. All that is necessary to obtain information concerning how the tables are laid out is to go to one of the client-restaurants of ABC, such as City Café. Likewise, the tabletops are protected by a patent. Thus, the design is available to the public through the U.S. Patent Office. Patent and copyright law provide the exclusive means of obtaining a monopoly on a product that has been disclosed to the public. In contrast, "ownership of a trade secret does not give the owner a monopoly in its use, but merely a proprietary right which equity protects against usurpation by unfair means . . . ." If federal law leaves an object in the public domain, state law may not prohibit its copying. *Roboserve, Ltd. v. Tom's Foods, Inc.*, 940 F.2d 1441, 1455 (11th Cir. 1991).

Finally, plaintiffs have not demonstrated that any of this information has any significant economic value, as required by statute; and none is readily apparent.  Put simply, plaintiffs have failed to demonstrate that any of the information obtained by defendants meets the definition of "trade secret" as set out above.  Therefore, none of the "information" obtained by defendants is "trade secret" information as that term is defined in the ATSA.

## B. Interference with Contractual Relationship

In Count Two of the amended complaint, plaintiffs allege that Lake intentionally interfered with their contractual relationship with City Café.  Under Alabama law, interference with a business or contractual relationship requires:

1.  The existence of a contract or business relation;

2.  Defendant's knowledge of the contract or business relation;

3.  Intentional interference by the defendant with the contract or business relation;

4.  Absence of justification[4] for the defendant's interference; and

---

[4] The fourth element of a claim for tortious interference with business relations--the absence of justification-actually relates to an affirmative defense to be pleaded and proved by the defendant. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1257 (11th Cir. 2002).

     5.  Damage to the plaintiff as a result of the defendant's interference.

*Gross v. Lowder Realty Better Homes & Gardens*, 494 So.2d 590, 597 (Ala. 1986).

Plaintiffs allege that they have met all of these requirements.  They assert, first of all, that a contract or business relationship existed between ABC and City Café.  This is correct as far as it goes.  However, the contract then existing between ABC and City Café was not the subject of interference by defendants.  The contract between ABC and City Café called for ABC's tables to be placed in City Café for a set period of time.  There is no evidence that this contract was subject to interference by Lake.  It is not disputed that the term of the contract was about to run its course.  It is also undisputed that no one from ABC had approached the owner of City Café about entering into another contract with ABC until Lake did so.  Lake approached Barger in August.  The current contract was due to expire in November.

However, once Lake discovered that the contract was about to expire, he did not bring this to Crabtree's attention.  When Lake attempted to negotiate a deal with City Café, Crabtree told him that he could not work in Tuscaloosa until the survey was finished.  Lake also was told that someone else had asked to be allowed to work the Tuscaloosa area and that Lake could only work the area if this person decided not to do so.

While Barger made it clear that, unless ABC agreed to pay him a percentage of the ad revenue, he would not renew with ABC, and Crabtree testified that this was something that he "strongly encouraged against," he did not testify that he would not enter into such an agreement under any circumstance.  (Crabtree Depo. at 69-70). Furthermore, there is no evidence that Lake ever brought this request to the attention of Crabtree to give him the opportunity to negotiate with Barger, even though this occurred during a time Lake considered himself to be working, albeit as an independent contractor, for ABC.  When Lake discovered he was not going to be able to profit by making a deal with Barger to renew his contract with ABC, he simply decided to make one between himself and Barger, cutting out ABC.

Although Lake argues that Crabtree would not have agreed to give Barger a percentage of the ad revenues, this is not completely accurate.  As noted above, while he strongly encouraged against such a practice, Crabtree never had the opportunity to agree or disagree with such an arrangement.  Likewise, there is no way to determine whether he might have been able to reach some other accommodation with Barger because, viewing the evidence in plaintiffs' favor, Lake interfered with the relationship before Crabtree had the opportunity.  Furthermore, plaintiffs do not have to demonstrate that "but for" the actions of Lake, ABC would have entered into another contract with Barger.

When there are only expectancy interests, defendants have tried to argue that in order for a plaintiff to prove damages the plaintiff must show that but for the interference, the expectation would have been fulfilled. Thus, a plaintiff would have to show, in other words, that but for the interference, it would have been awarded an expected or hoped-for contract. Some jurisdictions have adopted this approach. In these jurisdictions, "(t)he plaintiff must allege both unlawful means and that a contract would have resulted but for the interference." In that sense, therefore, the "but for" concept can be thought of as an element of proof rather than as a damages rule. As with other aspects of the tort, the concepts are blurred, but in those jurisdictions that have a "but for" aspect to their tort, it is an important element of proof.

\* \* \*

Alabama has specifically rejected the "but for" causation requirement as an element of a claim. *See K.W. Plastics v. United States Can Co.*, 131 F.Supp.2d 1265, 1270 (M.D. Ala. 2001); *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So.2d 1345, 1353 (Ala. 1991). Alabama courts say that what is protected "is the right to do business in a fair setting." *Utah Foam Prods., Inc.*, 584 So.2d at 1353. *See also K.W. Plastics*, 131 F.Supp.2d at 1267.

The Alabama courts, therefore, consider this right to be a protected property right. Consequently, in order to establish a *prima facie* case, a plaintiff is not required to prove that a contract would have resulted absent interference. *Utah Foam Prods., Inc.*, 584 So.2d at 1353.

\* \* \*

Thus, in Alabama, a defendant will not prevail by arguing that a plaintiff cannot succeed on a tortious interference with a business relationship claim without proof that "but for the alleged interference by (the defendant) it would

have been awarded" the contract or business deal for which it had the expectation. *Id.* at 1352. Similarly, Alabama law does not require the plaintiff, in order to prove damages, to "establish that 'but for' the interference (it) would have been awarded the contract." *Id.* at 1353. In fact, the Alabama Supreme Court specifically has stated that "(s)uch a burden would be too harsh on the plaintiff." *Id.*

* * *

Accordingly, Alabama recognizes three categories of damages: "(1) the pecuniary loss of benefits of the contract or the prospective relation; (2) consequential losses for which the interference is a legal cause; and (3) emotional distress or actual harm to reputation if either is reasonably to be expected to result from the interference." *K.W. Plastics*, 131 F.Supp.2d at 1268. Thus, Alabama does not require that a plaintiff demonstrate "that the defendant's actions were the only cause of damage that the plaintiff may have suffered" in order to make a *prima facie* case. *Union Sav. Am. Life Ins. Co. v. N. Cent. Life Ins. Co.*, 813 F.Supp. 481, 492 (S.D. Miss. 1993).

This reduced burden of proof also applies to damages and allows a plaintiff to recoup damages even when the plaintiff cannot show that but for the defendant's interference it would have gotten a contract, i.e., the plaintiff can look to other measures of damage that do not require a but for analysis. *Id.*

*Tortious Interference With Business Relationships: The Changing Contours of This Commercial Tort*, 35 Cumb. L. Rev. 317, 381-83 (2004-2005).

Consequently, while Lake did not interfere with a current contract, there is evidence that Lake interfered with the "business relations" between ABC and City Café.  However, the analysis does not end there.

> "After proving the existence of a contract, it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a 'third party,' i.e., a 'stranger' to the contract with which the defendant allegedly interfered."  *Atlanta Market Ctr. Management Co. v. McLane*, 269 Ga. 604, 608, 503 S.E.2d 278, 282 (1998); *see also Alcazar Amusement Co. v. Mudd & Colley Amusement Co.,* 204 Ala. 509, 86 So. 209 (1920). This is so, because "a party to a contract cannot, as a matter of law, be liable for tortious interference with the contract." *Lolley v. Howell*, 504 So.2d 253, 255 (Ala. 1987).
>
> "One is not a stranger to the contract just because one is not a party to the contract . . . ."  *McLane*, 269 Ga. at 608, 503 S.E.2d at 282.

*BellSouth Mobility, Inc. v. Cellulink, Inc*.,  814 So.2d 203, 212 (Ala. 2001).

According to the evidence, viewed in the light most favorable to plaintiffs, Lake interfered with a prospective business relationship between ABC and City Café at a time when he was an independent contractor for ABC.  As an independent contractor, Lake was a "stranger" to the business relationship that existed between ABC and City Café and owed a contractual duty of loyalty to ABC.  *See Amedas, Inc. v. Brown*, 505 So.2d 1091 (Fla.App. 1987) (medical goods seller stated cause of action against independent contractor-sales representative for interference with

business relationship and breach of contractual duty of loyalty when sales representative entered into private contract with customer of seller).   As a consequence, summary judgment is not appropriate with regard to this claim.

## C.  Breach of Contract

Plaintiffs also allege that there is sufficient evidence that Lake breached his Independent Distributor Agreement with plaintiffs.  Paragraph 19 of the Independent Distributors Agreement required that Lake deposit $12,000 before commencing actual sales presentations to restaurants and advertisers.  (Doc. #60, Appendix 1C, Independent Distributor Agreement, at ¶ 19).  There is no dispute that Lake failed to do this.  Thus, when he began to discuss with Barger the possibility of renewing his contract with ABC, while working as a distributor for ABC, but before he paid the $12,000 deposit, he breached the contract.  Likewise, Lake violated paragraph 12 of the Independent Distributor Agreement when he began to make a sales presentation at City Café without first obtaining written permission from ABC to do so.

Defendant asserts that it was plaintiffs who breached the contract.  He claims that, because he was told that he could not work in the Tuscaloosa area, this was a breach of the contractual term that states that there are no geographical restrictions on where he could work.  However, this is incorrect.  The contract states that there are no "geographical boundaries" regarding sales areas.  It also required written

permission to work a particular restaurant.  In other words, unlike many companies involved in sales, distributors were not restricted to a particular work area.  They could go anywhere in the United States to sell that they wished.  The only caveat was that they had to get written permission before they worked a particular restaurant. According to Crabtree, this policy was intended to allow distributors to work where they wanted while keeping too many distributors from working in the same area, thus taking away from each others' sales.

Although Lake testified that it was important for him to be able to work in the Tuscaloosa area, this was never communicated to anyone at ABC at the time he signed on to work as a distributor.  Baker is another third-party distributor, not an agent for ABC.  Furthermore, Baker suggested to Lake that he talk to Crabtree directly before he signed on to work for ABC (Lake Depo. at 38), but Lake never did so.  (*Id*. at 39).  In addition, even if Jack Baker is considered to have been making representations on behalf of ABC when he recruited Lake, it is the contract itself that governs the rights and privileges of the parties.  The requirement that distributors obtain written permission before working a particular restaurant was clearly stated in the contract and initialed by Lake.  Thus, Lake was put on notice that there were some restrictions on where he could make sales.  Otherwise, there would be no need to include this paragraph in the agreement.

In addition, Lake has no basis to complain of a breach of the agreement for this stated reason because he failed to conduct business for ABC in a loyal or ethical manner, in violation of his agreement with ABC.  By his own testimony, Lake admits that, when Barger told him he wanted a percentage of the ad revenues before he would renew with ABC, Lake told Barger that if ABC would not do this, Lake would. Thus, before he even knew that ABC disfavored providing a percentage of ad revenues to restaurant owners and before he found out that he would not be allowed to work in that area, he was offering to privately provide Barger what he wanted. Lake did not attempt to negotiate with him on behalf of ABC or try to find some acceptable middle ground.  He simply took the business for himself.  Furthermore, when he discovered that providing ad revenues to clients was not something ABC generally encouraged and that he was restricted from working in the Tuscaloosa area, at least for the time being, he immediately began to negotiate with Barger on his own. Even though Lake spoke personally to Crabtree during this time period, he never told Crabtree that he was quitting or that he was going into business for himself.  (Lake Depo. at 67).  Furthermore, until instructed to return the tabletop and documents by counsel after the lawsuit was instituted, Lake retained the sample tabletop and documents he received from ABC.  He adopted these documents for use with his own company and used the tabletop as a sample when making sales calls.

Based on this, defendant has not established that plaintiffs cannot prove that Lake breached the Independent Distributor Agreement.

## D. Unjust Enrichment/Misappropriation of Confidential Information

### I. Unjust Enrichment

Plaintiffs assert, in Count Seven, that defendant was unjustly enriched by the use of the ABC tabletop to further his own business. (*See* Lake Depo. at 176). He also made use of the ABC Sales Kit and its included contracts and other documents.

> "To prevail on a claim of unjust enrichment, the plaintiff must show that the '"defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud."' *Dickinson v. Cosmos Broad. Co.*, 782 So.2d 260, 266 (Ala. 2000) (quoting *Hancock-Hazlett Gen. Constr. Co. v. Trane Co.*, 499 So.2d 1385, 1387 (Ala. 1986)) (some emphasis omitted; some emphasis added). "The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another." *Battles v. Atchison*, 545 So.2d 814, 815 (Ala.Civ.App. 1989).

*Scrushy v. Tucker*, 955 So.2d 988, 1011 (Ala. 2006).

The retention of a benefit is unjust if:

> "'(1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the

> recipient may have been enriched, but he is not deemed to have been unjustly enriched.'" *Welch*, 891 So.2d at 843 (*quoting Jordan*, 705 So.2d at 458). The success or failure of an unjust-enrichment claim depends on the particular facts and circumstances of each case.

*Mantiply v. Mantiply*, 951 So.2d 638, 654-55 (Ala. 2006).

The action on the part of Lake in negotiating a deal for himself with Barger could be considered unconscionable conduct sufficient to present a *prima facie* case of unjust enrichment. However, Lake did not make use of the tabletop to induce Barger to contract with him. Barger already had the tabletops. Likewise, while Lake may have made use of the documents provided by ABC to Lake for use as an independent contractor for ABC, it is, at best, *de minimis.*

However, Lake used the tabletop and documentation supplied to him by ABC after he left the company in order to make two more sales for himself. He did not return the items he received from plaintiffs until told to do so by counsel. Viewing the evidence in the light most favorable to the non-moving party, there is evidence that defendant breached his contract with ABC on the first day he received his materials, including the tabletop, from ABC. There is also evidence that he dealt with City Café for his own benefit during a time that he was contractually obligated to deal ethically and in good faith with ABC. Thereafter, he kept the material, including the

proprietary tabletop, that had been supplied to him by ABC and used it for his own benefit, obtaining two contracts to place tabletops with ads in restaurants.

ABC relied on Lake's duty to deal ethically and in good faith with ABC.  "An agent must not, except where the principal has full knowledge and gives consent, assume any duties or enter into any transaction concerning the subject matter of the agency in which he has an individual interest or represents interests adverse to those of his principal."  *Naviera Despina, Inc. v. Cooper Shipping Co.*, 676 F.Supp. 1134, 1141 (S.D.Ala. 1987) (quoting *Amoco Production Co. v. Jacobs*, 746 F.2d 1394, 1400 (10th Cir. 1984)).

"The principal-agent relationship is fiduciary by nature and imposes a duty of loyalty, good faith and fair dealing on the agent. The fiduciary relationship arises not only from a formal principal-agent contract, but also from informal relationships of trust."  *Naviera Despina*, *supra* (citation omitted).  *See also, Construction Techniques, Inc. v. Dominske*, 928 F.2d 632, 638 (4th Cir. 1991).   By misappropriating ABC's tabletop, Lake made two sales that, in equity, should have accrued to the benefit of ABC.  Based on this, there is sufficient evidence to make out a *prima facie* case for unjust enrichment.

## II.  Misappropriation of Confidential Information

The claim of misappropriation of confidential information in Count Seven is simply an attempt to invoke the common law cause of action for the misappropriation of trade secrets.  Plaintiffs cannot pursue both statutory and common law theories of recovery for defendants' alleged misappropriation of "trade secrets" or confidential documents.  The Alabama Trade Secrets Act "is intended to both codify and to modify the common law of trade secrets in Alabama."  Comment, § 8-27-6.  The committee's comments to the Act indicate that the legislature intended for the Act to replace common law tort remedies for the misappropriation of trade secrets while leaving existing contract remedies or safeguards in place.  *Id.*; Long, *The Alabama Trade Secrets Act*, 18 Cumb. L. Rev. 557, 562 (1988).  Because existing common law tort theories of recovery have been replaced by the provisions of the Act, summary judgment as to this claim is due to be granted.  *Allied Supply Co., Inc. v. Brown*, 585 So.2d 33, 37 (Ala. 1991).

## E.  Suppression

Plaintiffs allege that Lake suppressed the fact that he did not intend to abide by the terms of his Independent Distributor Agreement and, instead, intended to copy the design of the tabletop display and manufacture and sell the tabletops to customers without benefit to ABC.  Lake responds that this claim is without merit because he

did not intend to break his Independent Distributor Agreement at the time he made it and did so only after he perceived that ABC had breached the contract between them by not allowing him to work in the Tuscaloosa area.  Thus, he asserts that he did not suppress an existing material fact.

Lake was under no obligation to inform ABC that he intended to resign and start his own company.  *Allied Supply Co. v. Brown*, 585 So.2d at 36.  The decision to keep the materials supplied by ABC came sometime after he received them.  Therefore, he did not suppress an existing material fact by resigning and going into business for himself without first advising ABC.  Likewise, there is no evidence that Lake intended to use the tabletop and other material supplied by ABC for his own benefit at the time he signed on as an independent contractor for the company.  Thus, this also was not suppression of a material fact.  Consequently, summary judgment as to this claim is due to be granted.

## PLAINTIFFS'/COUNTERCLAIM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendant/counterclaim plaintiff Lake (defendant) has alleged that plaintiffs/counterclaim defendants ABC Advertising and Crabtree (plaintiffs) interfered with defendant's business and defamed him by contacting prospective restaurant customers and advertising customers and representing to them that

defendant's business was unlawful and/or illegal, and that defendant would be precluded from performing any agreement with them. According to defendant, this conduct and the institution of plaintiff's lawsuit against defendant, including the claim that defendant had misappropriated trade secrets, was an effort to eliminate competition in the tabletop advertising business in violation of law. He demands compensatory damages, attorney's fees and costs. (Doc. #22, Answer to Complaint and Counterclaim).

**A. Defamation**

> To establish a *prima facie* case of defamation, the plaintiff must show [1] that the defendant was at least negligent, [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable *per se*) or actionable upon allegations and proof of special harm (actionable *per quod*).

*Delta Health Group, Inc. v. Stafford*, 887 So.2d 887, 895 (Ala. 2004) (citations omitted).

With regard to the second element, the only person whom defendant has demonstrated had a conversation with Crabtree and who could remember any significant details was Buddy Hall. For example, Barger recalls that Crabtree called him a couple of times, but he does not remember what was said. (Barger Depo. at 48, 49). According to Barger, Crabtree let him know that there was a disagreement about

the tables, but he could not remember any details of the conversation, except that Crabtree told him that he had trouble like this before and had never lost a case.  (*Id.* at 50-51).

There is nothing *per se* slanderous in the only statement by Crabtree that Barger could recall.  If the injurious character of the words appears, not from their face in their usual and natural signification, but only upon consideration of extrinsic facts showing the circumstances under which the words were said or the resulting damages to the defamed party, they are defamatory or actionable *per quod*.  Thus, to prevail, Lake would have to demonstrate that it is somehow slanderous *per quod*.  He has failed to do so.  Crabtree is alleged by Barger to have characterized his dispute with Lake as a disagreement about tables.  The statement by Crabtree reflects nothing more than the fact that he has engaged in litigation in the past regarding such disagreements and he has never lost a case.  This does not impute a crime or other odious behavior concerning Lake to Barger.

In addition, slander *per quod* requires proof of "special damages" which means demonstrating a monetary loss.  *Butler v. Town of Argo*, 871 So.2d 1, 18 (Ala. 2003). Although Lake asserts that he has suffered mental pain and anguish, he has not shown that he suffered any type of monetary loss.  He suffered no loss of business from Barger; in fact, Barger's testimony reflects that he is continuing to do business with

Lake. The tabletops provided by Lake are still being utilized by the City Café. Only slander *per se* is actionable without a proof of monetary loss. There is no proof of any such loss here. Therefore, this remark is not sufficient to avoid summary judgment.

Michelle Johnson, a waitress at a restaurant where Lake later sold tabletops, testified that she has never spoken to Crabtree in person or on the telephone. (Johnson Depo. at 27-28). Therefore, there is no slander or defamation shown.

Buddy Hall testified that he owns a restaurant, Buddy's Rib and Steak, in Northport, Alabama. (Hall Depo. at 8). He recalls being called by Crabtree about the tabletops that Lake was installing in his restaurant. Hall stated that Crabtree:

> wanted to know if they were putting them [tabletops] in and he let me know real quick like that it was his franchise, it was his tables, and that he knew that they had been put in several different places and that Paul Lake used to work for him . . . . And he says he is stealing my advertisement . . . .

(*Id*. at 37). He also stated:

> The main thing that sticks put about me is how, I mean, you know, if you put them tables in there, I am going to sue you and Paul Lake and everything else. He is breaking the law and all of this, that and the other. Paul Lake used to work for me and he is stealing from me.

(*Id*. at 41-42). Hall considered Crabtree's attitude to be "overbearing" (*id*. at 42), and Hall continued to do business with Lake. (*Id*. at 43).

The Alabama Supreme Court has firmly held that larceny falls within the definition of an indictable criminal offense involving infamy or moral turpitude and that, therefore, words that impute the offense of larceny are slanderous *per se*. *Liberty Nat'l Life Ins. Co. v. Daugherty*, 840 So.2d 152, 158 (Ala. 2002); *Sunshine Invs., Inc. v. Brooks*, 642 So.2d 408, 410 (Ala. 1994); *Nelson v. Lapeyrouse Grain Corp*., 534 So.2d 1085, 1091-92 (Ala. 1988); *Phillips v. Bradshaw*, 167 Ala. 199, 52 So. 662 (1910).  However, there is no slander *per se* when the implications of the statement are ambiguous.

For instance, in *Blevins v. W.F. Barnes Corp*., 768 So.2d 386 (Ala.Civ.App. 1999), the Alabama Court of Civil Appeals held that a statement that the plaintiff "tried to extort money out of me because I refused to pay his demands" was not slander *per se*. The Court of Civil Appeals reasoned that because the word "extort" had at least two meanings, the statement at issue was not slander *per se*.

Like the word "extort," the word "steal" is not limited in meaning to that defined by the criminal statutes.  For instance, among other definitions, "steal" is defined by Webster's II, New Riverside University Dictionary (1984) as "to take or use as one's own something invented by another."  It is also defined as "to get or accomplish something secretly or artfully."  (*Id.*).  *See also Cottrell v. National Collegiate Athletic Assoc.*, 2007 WL 1696564, *33 (Ala. June 1, 2007) (neither the

statement that plaintiff was a "recruiting cheater" nor the statement that he funneled money from a football booster to a prospective player imputed a crime of infamy or moral turpitude).

The statements made by Crabtree, viewed in context, reflect that Crabtree was asserting that Lake was stealing from him in the sense that he was stealing business from him by selling tabletops containing ads to Hall.  For doing this, Crabtree threatened to sue.  He did not state or imply that Lake had committed a crime of infamy or moral turpitude.   He did not tell Hall that Lake had stolen trade secrets or had committed the offense of criminal impersonation.   Furthermore, Crabtree's statements are not sufficiently "incompatible with the proper conduct of his lawful business . . ." to qualify as slander *per se*.

Lake's citation of *Ledbetter v. United Ins. Co. of America*, 845 F.Supp. 844, 847 (M.D.Ala. 1994) is of questionable authority for his assertion.  *See Liberty Nat'l Life Ins. Co. v. Daughtery*, 840 So.2d at 156-57 (questioning the holding in *Ledbetter*).  In *Daughtery*, the Alabama Supreme Court noted that under current Alabama law the standard for determining whether a statement is actionable *per se* differs depending on whether the case involves libel or slander.  In cases of libel, if the language used exposes the plaintiff to public ridicule or contempt, though it does not embody an accusation of crime, the law presumes damage to the reputation and

pronounces it actionable *per se*, while to constitute slander actionable *per se*, there must be an imputation of an indictable offense involving infamy or moral turpitude. *Id.* (citing *Ceravolo v. Brown*, 364 So.2d 1155 (Ala. 1978)). Based on the holding in *Daughtery*, this case involves, at best, slander *per quod*. As a result, Lake must plead and prove special damages. *Anderton v. Gentry*, 577 So.2d 1261, 1263-64 (Ala. 1991). He has not done so.

The only damages alleged by Lake are emotional distress and mental anguish. "Special damages are the material harms that are the intended result or natural consequence of the slanderous statement, *see Harrison v. Burger*, 212 Ala. 670, 103 So. 842, 844 (1925), and the general rule is that they are limited to 'material loss capable of being measured in money,' Restatement (2d) of Torts § 575, cmt. b, at 198." *Butler v. Town of Argo*, 871 So.2d 1, 18 (Ala.,2003) quoting *Shook v. St. Bede School*, 74 F.Supp.2d 1172, 1180 (M.D.Ala. 1999).

> "While it may be odious to berate someone in public with threats and ethnic slurs and to attack someone with epithets such as 'dead beat' and 'crook,' such questionable behavior is, nevertheless, not actionable in Alabama absent allegations of special damages. Even under our liberalized rules of procedure, Rule 9(g) [, Ala. R. Civ. P.,] still requires special damages to be specifically stated, and without them [a] complaint does not state a claim upon which relief can be granted."

*Butler*, 871 So.2d at 18-19, quoting *Ceravolo v. Brown*, 364 So.2d at 1157.

Defendant has failed to provide any proof of special damages as required by Alabama law regarding the comments made by Crabtree to Buddy Hall and has failed to provide any evidence that any other slanderous comments were published to anyone else.  Therefore, he has failed to make out a *prima facie* case of defamation.

## B.  Intentional Interference With a Business or Contractual Relationship

Defendant also alleges that plaintiffs interfered with a business or contractual relationship by calling Barger and Hall and attempting to dissuade them from doing business with Lake.

Plaintiffs' motion for summary judgment is based strictly on their assertion that Lake has failed to prove that he has suffered any damages.  Under Alabama law, categories of recoverable damages for intentional interference with prospective business relations are:  (1) pecuniary loss of benefits of contract or prospective relation; (2) consequential losses for which interference is legal cause; and (3) emotional distress or actual harm to reputation, if either is reasonably expected to result from interference.  *KW Plastics v. United States Can Co.*, 131 F.Supp.2d 1265, 1268 (M.D.Ala. 2001) (citing Restatement (Second) of Torts § 774A (1979)).[5]

---

[5] Section 774A reads, in pertinent part:

> (1) One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for

As a general rule, damages cannot be received for mental anguish arising from a breach of contract. Alabama does, however, recognize a limited exception to this rule. Under Alabama law, "[d]amages for mental anguish can be recovered . . . where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering." *Liberty Homes, Inc. v. Epperson*, 581 So.2d 449, 454 (Ala. 1991) (quoting *F. Becker Asphaltum Roofing Co. v. Murphy*, 224 Ala. 655, 141 So. 630, 631 (1932)).

The majority of the cases in which a plaintiff has been allowed to recover damages for mental anguish involved actions on "contracts for the repair or construction of a house or dwelling or the delivery of utilities thereto, where the breach affected habitability." *See, e.g., Epperson*, 581 So.2d at 454; *Orkin Exterminating Co. v. Donovan*, 519 So.2d 1330 (Ala. 1988); *Lawler Mobile Homes, Inc. v. Tarver*, 492 So.2d 297 (Ala. 1986); *Alabama Power Co. v. Harmon*, 483 So.2d

---

(a) the pecuniary loss of the benefits of the contract or the prospective relation;

(b) consequential losses for which the interference is a legal cause; and

(c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.

Restatement (Second) Torts § 774A (1979).

386 (Ala. 1986). Because a person's home is said to be his "castle" and the "largest single individual investment the average American family will make," these contracts are "so coupled with matters of mental concern or solicitude or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering." *B & M Homes, Inc. v. Hogan*, 376 So.2d 667, 671-72 (Ala. 1979). Where such a contractual duty is breached, the Alabama Supreme Court has said that "it is just that damages therefor be taken into consideration and awarded." *Id*. at 671.

A smaller number of cases has permitted such recovery in actions involving the burial of loved ones, suits based on a physician's promises to deliver a child, and claims based on the breach of a new car warranty where the owner suffers significant fear, anxiety, and embarrassment. *See Taylor v. Baptist Med. Ctr, Inc.*, 400 So.2d 369 (Ala. 1981); *Volkswagen of America, Inc. v. Dillard*, 579 So.2d 1301 (Ala.1991).

The Alabama Supreme Court has made very clear, however, that all these cases represent an exception to the general rule prohibiting mental anguish damages for breach of contract. These cases deserve special treatment because it is highly foreseeable that egregious breaches of certain contracts–involving one's home or deceased loved one, for example–will result in significant emotional distress. *See Sexton v. St. Clair Federal Sav. Bank*, 653 So.2d 959, 962 (Ala. 1995). The

contractual duties imposed by these contracts are so sensitive that a breach will necessarily and foreseeably result in mental anguish. *Orkin Exterminating*, 519 So.2d at 1333. The rule in Alabama remains, however, that recovery of mental anguish damages is permitted for breach of contract only in a narrow range of cases involving contracts which create especially sensitive duties, the breach of which cause highly foreseeable and significant mental anguish. *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1361 (11th Cir. 2000).

This same rule is applicable to claims of interference with a contract or business relationship. Under the facts of this case, emotional distress of the type recognized in Alabama for a breach of contract is not reasonably expected to result from the interference with contract alleged by defendant. Lake suffered no loss of business, and no customers refused to deal with him in the future as a result of the actions of Crabtree. He also suffered no consequential damages. Thus, this case is not the type of case that is sufficiently egregious such that it is reasonably foreseeable that Crabtree's actions would "result in *significant* emotional distress." *Sexton*, 653 So.2d at 962 (emphasis added). Therefore, no damages for emotional distress are recoverable. Because no damages are recoverable by Lake, he has failed to establish a claim for interference with a contract or business relationship.

## CONCLUSIONS

After review of the evidence and the parties' briefs as outlined above, the court finds as follows:

(1) Plaintiffs' Motion for Summary Judgment as to defendant/counterclaim plaintiff's claims is due to be granted.

(2) Defendant's Motion for Summary Judgment as to plaintiffs' claims for misappropriation of trade secrets (Count One), misappropriation of confidential information (Count Seven), and suppression of a material fact (Count Eight) is due to be granted.

(3) Defendant's motion for summary judgment as to plaintiffs' claims of intentional interference with a business relationship, breach of the Independent Distributors Agreement and unjust enrichment is due to be denied.

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 10th day of March, 2008.

_____
HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE